Good morning. You have probably already noticed we're missing someone who actually should be sitting here. That would be Justice Shostak. But she is unable to be with us today. She will participate in conferences with us, as well as hear the oral argument. So make sure you speak clearly into the microphone so she can hear everything. And also, if you know protocol, Justice Hudson's in the wrong place. But I've asked Justice Hudson to go there so that I'm having some back problems. So if I fall, I'll fall on him when we leave. And thank you. But he doesn't have to wait for me when we get out. So it's a little different if you're familiar with the protocol. But now I think we are ready. So, Mr. Johnson, whenever you are ready, we are ready. May it please the Court, Counsel? Your Honors, first of all, I want to apologize because I have a bit of a cold today myself. So if my voice is inappropriate or modulating, please tell me. Well, let's make sure Justice Shostak can hear you. And maybe we should get a doctor in here before it gets so warm. It's that time of the year. Your Honors, this is a judgment that should be reversed. A short timeline. The judgment originally, judgment of dissolution, originally was added December 21, 2000, down in Will County. Subsequently, on October 10, 2001, there were three orders entered. Two quadros and one agreed order that resolved all of the distributions, the named distributions, under paragraph 21 or 22 of the judgment. Well, that raises a problem immediately. I know what the order says. I've seen it. I've read it. But we have some things in the marital settlement agreement about retirement or pension programs. They're not specifically named. There are three named, but they're not even correctly named. They have different actual titles when you look at the plans. So how can we say that that order resolves all when we don't have all of those pensions identified? I think we can do it, Your Honor, first of all, because the ones that are identified were qualified funds and were resolved ultimately in 2001 with the three out orders that I mentioned. And if there was an omission and a failure to include the excess plan three, respectfully, I think that the burden for failing to include that is on the appellee, because the appellee's attorney is the one who drafted these agreed orders and documents. Well, who drafted the marital settlement agreement? The marital settlement agreement was drafted by counsel for Melissa. There's no dispute about that. And also, I would point out that in the judgment on page 11, it clearly indicates, clearly, or excuse me, paragraph 11 in the judgment clearly indicates that both parties were fully aware of all of the assets and debts, and they've disclosed everything to each other. Well, in fact, the marital settlement agreement, and I'm trying to find it as we speak, talks about the pension or retirement plans. Are we, are you saying that the excess three, and that's what I'm going to call it. Excess two. Excess two. See, I don't even remember. But excess two is not something to be received in retirement? Your Honor, first of all, it was our position that because of the evidentiary hearing that was held here, and based upon my client Thomas's unrebutted testimony, he paid, there was a payment that was exchanged for that retirement plan. And that payment was $16,880 right on the eve of the presentation for the settlement agreement. And one of the reasons I believe, perhaps, that this non-qualified, and it's critical, it's critical as far as the distinction between a non-qualified plan and a qualified plan, particularly here, because the non-qualified plan contained a non-alienation clause. So it would have made all the sense in the world so that this didn't get later upset by Hartford or anybody else to have settled this and not included the excess plan two in the judgment. Could we get back to a fundamental question? Pardon me, Your Honor. Could we get back to a fundamental question? Wasn't it the clear intent of the marital settlement agreement to allocate all of Thomas, the marital portion of all of his plans, irrespective of whether or not they were qualified or not qualified? I don't believe so. And if you take a look respectfully at the reservation clause, in paragraph 22, the wife should be named as the surviving spouse of the husband's Hartford pension plan, which ultimately was distributed. The aforesaid assets shall be divided, pursuant to qualified domestic relations orders, if said orders are acceptable to the plans. In the event such orders are not acceptable, the court reserves jurisdiction regarding the division of these assets, the aforesaid assets, contained in paragraph 22. That's all this reservation clause references. So what was supposed to happen to the things that were not named, including excess plan two? What was supposed to be the division of that? We just forget about it, or how was that treated then? Your Honor, it was a position of our client, based upon the payment that he made under paragraph 21 of the judgment, that he, in the negotiation process, paid for that plan. So that was the quid pro quo you're saying for that? That's right. And also because the non-qualified plan couldn't be valued at the time of the judgment. These non-qualified plans are strange animals. They're very difficult to value because they're all in the hands of the company. But when the quadro was presented, and later communications between the ex-wife and the company, they were talking about a $3,100 amount that she would receive. Even though this was a, you say, non-valued plan, this is also what's called a top hat plan, which has all sorts of idiosyncrasies, so to speak, in them, as well as the fact that this alienation clause you're talking about is often disregarded by pension administrators because they don't want to basically argue about it. And one last thing, doesn't it appear that this pension administrator did not want to argue and said she was entitled to $3,100? Your Honor, I understand what the letter said. I think that the letters really are contradictory to what both litigants represented to the court at the time of the judgment. They're also hearsay. And when we look at paragraph 11, these parties knew what they had. They swore to it. These words and this judgment, in those regards, it has to have meaning. Well, I mean, I didn't see any evidence in this record that she sat down with him on a regular basis and looked through all of his assets and looked through all of the things that they had. He had several of these types of plans because this is what he did for a living. He knew how to set these up. He knew how to define them. He knew how to distribute them. Where in the record does it say she knew that he had done this, other than the document that says, I think I know everything? Certainly, it doesn't specifically say that in those words, but in the prove-up of the matter, there was no question. Melissa said, sure, my lawyer knows all the assets. And she said that she had received a complete and full disclosure of the assets in paragraph 11. Well, if she said my lawyer knows, if they had never tendered it, how would he know or she know? Your Honor, with all due respect, I think we have to presume that they tendered it because of the reason of paragraph 11 where these parties make a representation to the court under Roe that they had this information. And even if we go past that for just a moment, remember, there was no action brought here. First of all, until 2016, long after the order that was entered subsequently on October 31st, 2008, which settled all issues of property distribution. And that's why we raised the issue to this court, and it was raised in the trial court in Thomas' final argument that Ray Stupak should apply here. What about, let's go back to one thing you just said. What about the fact that I believe that Melissa testifies that the $16,000 was part of a bonus that had been awarded subsequent to the actual judgment, but during the period of the marriage. And this was the balance of that particular distribution. I know she testified to that, and Your Honor is absolutely correct. But we would also be correct to tell the court that her testimony directly contravenes the very terms of the judgment that her attorney prepared. This $16,000 had nothing to do with support because it states directly that that was a property distribution. Correct, of a bonus that he received, which would be marital property, because the bonus occurred during the marriage. But this was a property distribution, Your Honor. Melissa testified, as you just noticed or just mentioned, that it was a support issue. No, I said it was a distribution of $16,000 from a bonus he received. I didn't say it was support. I said it was a distribution. But Melissa said it was support. He owed me back due support. And if that were true, this would not be regarded or mentioned in this judgment as a property distribution. Those are critical terms. Well, then let's look at the difference, though. Let's go to the end where our trial judge, Judge Cerny, awards a considerably more amount of back pay or back due from this account, this XS2. How do we reconcile those two differences? Very simple. Because at the time of the judgment, this account couldn't be valued. My client never received any money on this account until approximately 2011 or so. When he said he was forced to take it, which also seems to defeat your argument that he didn't even know that this was something he had to take. So if this is something he wasn't aware of, how can Melissa be aware of it? Well, first of all, Your Honor, I don't believe the burden is on him. I believe, first of all, the burden is on Melissa. She's the one who brought this petition. Secondly — But the burden is on her to show what? Pardon me, Your Honor? The burden is on Melissa to establish what specifically? That something — that she didn't receive something that she should have, that she didn't know about. In fact, contrary to even 214.01, there was no allegations of fraud. There was no allegation of mistake of fact like there occurred in the Hall case. There was none of this. All it was was an initial petition to set up a quadro of an interest that couldn't be quadroed. In fact, all the way to 2016. But Hartford did quadro it when they sent that letter. They acknowledged the quadro and said she's entitled, as a result of these plans that are identified, to $3,100. I understand, Your Honor, but I have to say on behalf of my client, no one from Hartford testified to that. It was a bare, naked letter that couldn't be cross-examined or determined or anything else. Well, he didn't get a copy of that letter? No. I mean, he's sitting in that department making the plan. It's incredible to me that he did not know of that letter. He was not sent that letter. Well, let's go beyond that. He's there. He's planning these. He is their pension administrator or one of the people who does this. How does he not know about this? He sells these plans, but he wasn't a pension administrator. Your Honor, my time is up. I respectfully ask for all the reasons, and also I believe respectfully a clearer situation for Mae Shirikata that this judgment be reversed. Thank you. Thank you. You'll have an opportunity to reply if you choose. All right. Ms. Peterson. Thank you, Your Honor. Good morning, Your Honors. Counsel, may it please the Court. My name is Cynthia Peterson. I am the attorney for the Respondent and appellee in this matter. Your Honors, we would respectfully request that you affirm the trial court's release in this matter. First of all, I want to address the red herring in the room, and that is the non-alienation clause. ERISA itself has a non-alienation clause, and In Re, the Marriage of Hunt, actually addressed the issue of the non-alienation clause in ERISA, saying that it did not preclude the State of Illinois from including in its statute, 503, that the quadros could be entered to divide the plans. ERISA, in fact, in Section 29 U.S. Code 1056 D.1, requires the plans all to have non-alienation clauses. That means that even qualified plans have non-alienation clauses. A non-alienation clause is merely a vehicle which prevents outside creditors from attaching to the plan directly on behalf of a participant. So if a participant is sued in court, the creditor cannot come to the plan and say, I have this judgment. You have to honor it. That is the only vehicle through which the plan can stop that, is a non-alienation clause. Well, that makes perfect sense from what you're saying from a legal standpoint, but I'd like to get back to the threshold question. Obviously, the marriage settlement agreement didn't deal with Excess Plan 2, correct? It did, Your Honor. Specifically did? Well, that's the problem, Your Honor, is that counsel and Mr. Englehard would say that the Excess Plan was not included. And why was it not included? It could have been, correct? It could have been. It was included in that the Hartford Pension Plan was to be divided. The Hartford Pension Plan had two components. The Hartford Retirement Plan, as it was then called, had a non-qualified pension and a qualified pension. And so the Hartford Pension Plan would encompass both of those plans. None of the plans themselves were named. So wasn't that an oversight? That's part of why we're here. We're arguing over this. I don't believe it was an oversight, Your Honors. I believe that they intended to name the types of plans that were to be divided. And the terms these include included the 401K plan, which was not named the 401K plan. And it did include a non-qualified deferred compensation plan in that the Excess Deferred Compensation Plan, also by another name, was included. So when counsel says that the plans that were listed were all qualified plans, that's not true. The three types of plans that were listed were the 401K, the Excess Deferred Compensation, and the pension plan. So if we were to conclude there was an ambiguity of oversight in this American Settlement Agreement, Mr. Johnson's opining that that ambiguity should be resolved against the drafter of the document. What do you say in response to that? The term in the judgment itself says that all of the retirement plans of Mr. Engelhardt were to be divided. And it said that the marital portion of the husband's retirement benefits through his employer shall be equally divided by the parties. It says these include. The term these include is not an exclusive list. As in Raymond Edwards Hall, the pension plans themselves weren't even included in the division, yet because of that almost exact same language, it was determined that the judgment was not ambiguous. The intent of the parties was that the retirement plan of the husband were to be divided. And, in fact, in Raymond Edwards Hall, the language was even more restrictive in that the accounts, the balances, were to be divided. That can be actually deferred compensation plans and not they can be defined contribution plans rather than defined benefit plans, whereas this language is more encompassing of all retirement plans in that all retirement benefits were to be divided. Well, wouldn't you agree there would have been, though, a better way to make this point when we had so many different plans that your client, according to the judgment, should have been aware of? She said she was aware of these plans, yet they weren't really well identified, were they? Well, I think that, again, the types of plans was what were identified. Well, that's not what the judgment actually says. It says these plans. I mean, include these plans. It doesn't say this type of plan. Well, it says Hartford 401K Savings Plan, which that was not the name of the 401K plan. So when it says 401K Savings Plan, it's naming a type of a plan. When it's saying Hartford Excess Deferred Compensation Plan, the type of plan was a deferred compensation plan, an excess meaning that it was nonqualified. And the Hartford Pension Plan, which at the time was an all-encompassing Hartford retirement plan, included all portions. Well, at the time of this dissolution back in, what, 2001, was Melissa also in the pension business planning and selling these plans? Your Honor, my client was a stay-at-home mother and a pianist. So how do we know from this judgment that we're talking about types of plans as opposed to actual plans? Because of the fact that the quadros that were entered immediately after the judgment for dissolution of marriage were obviously naming the legal name of the plan. Many times in the judgment for dissolution of marriage, you will see language that it will say that the husband's 401K plan will be distributed, the wife's pension plan will be distributed. And then when you enter the actual order to divide it, which is the Qualified Domestic Relations Order, that order specifically names the name of the plan. Now, those orders and the names of the plan, when one goes to draft a Qualified Domestic Relations Order, that information comes from the plan. So the plan would have said, okay, well, here's the quadro information you need to divide the pension. And then when they approved it later, they said, you get 3104, which, of course, encompassed both plans. So through discovery, there's no way for counsel to get the exact plan information prior to the time a judgment's entered? There is, and there was some information tendered. What we received from Hartford and tendered at the trial level was a calculation which showed both. It was just called the Hartford Retirement Plan, and it showed both the amounts that totaled his benefit as 6208, which half of that was 3104. So at the time of the judgment, you were aware of that, in 2001? In 2001, I was not counsel for the. Well, your client was. So my client was only aware that he received a pension. That's all she knew at that time. She did not understand what that encompassed. Mr. Engelhardt, on the other hand, selling retirement plans, would understand what that encompassed. I assume that your argument would be very similar to this next question. Why is this not a modification since we have this new information that your client apparently didn't know at the time? Why isn't and if this isn't or if this is a modification, why aren't we alleging fraud or misrepresentation or something like that? Well, it isn't a modification, and that is because the language of the judgment provides that the assets would be divided pursuant to the qualified domestic relations orders if said orders are acceptable to the plans. Now, at the time that the quadra was entered, it was approved, and so everybody thought that everything had been divided at that time. But the court reserved jurisdiction that if the orders are not acceptable, the court reserves jurisdiction regarding the division of these assets. And since the division of the excess plan 2 has not been accomplished and can no longer be accomplished through a quadro, the court would reserve the jurisdiction regarding the division of those assets. Well, I thought Hartford said that they would grandfather this plan in. They did in 2012, Your Honor. And unfortunately, a client was not savvy enough to be able to find a counsel that could enter it at that time. And so by the time that we were in litigation in this matter, the plan will no longer honor a quadro. So we know that to be the fact. They will no longer honor a quadro. That's correct. All right. Counsel, there's another issue looming in this case I wanted to ask you about, and that is the priority of the court order. Directing Congress to obtain a life insurance policy to secure the death benefit. I'm curious, what is this $250,000 figure? What is it tied to, or what is the basis of that amount? The $250,000 was based upon insurance that he already had in place and was also based upon the 1,200, say, times 10 years of payment or five years of payment. The court awarded an amount that the life insurance companies would normally award, $250,000, $500,000, $1 million. That may all be true, but how does the court know if it's adequate? How does the court know if it isn't a windfall to her? Doesn't there have to be some legitimate rationale? You can't just pick a figure out of the air, can you? Well, $84,000 was for 70 months. And so if you double that for 140 months, you've already gone into over $160,000. So if she were to live for 15 or 20 years, it would likely be more than $250,000 for her portion. The total over 20 years, I believe, was $344,500. Can somebody consult a moody table? I guess I'm just trying to understand how this figure was arrived at. Other than some general applications. I believe it was more of a general application as far as the amount in that he was saying, okay, well, if it's, you know, this amount over 70, if you double that and give some more, then it's, you know, going to cover the amount. If we were inclined to remand this case for that specific determination, what would be your position? Your Honor, my position is that the court should require the amendment of the Qualified Domestic Relations Order in the Qualified Plan. That accomplishes two things. There's sufficient money being paid to Mr. Engelhardt that that $3104 wouldn't be less than what he is receiving now. And so there's sufficient monies per month to award her $3104 out of the Qualified Plan. What that accomplishes is, number one, it pays her as an offset from both plans and keeps the non-qualified plan issue out of the tax bill, in that if she is getting money from the Quadro, she receives the tax application, she receives the 1099-R. If she is paid triangular from Mr. Engelhardt in order to avoid the tax consequence, he would have to give her a 1099 miscellaneous, which would be more complicated tax-wise. So it accomplishes an offset. And in a way, the marriage of Allen basically said that we do whatever measure is necessary to enforce the judgment terms. And in this case, the amendment of the Qualified Plan to include a dollar amount would accomplish both of those things. And it would also avoid having to have the insurance in place because the ruling is that if the Quadro is not amended and he has to pay her directly, that's when a life insurance policy is to be maintained by him. And she is also named, I believe, as the surviving spouse on that particular, on the Qualified Plan, is that correct? Yes, that's correct. Which is another issue that came up otherwise. Correct. So the amendment of the original Qualified Plan to add in a dollar amount would accomplish all of those issues and avoid the tax complications that are created when it's a triangular payment. Now, he testifies that he has only contributed to this excess two for two years. But coming up with that amount of money, those must have been really good, you know, really good contributions. The question I have is, after the marriage, did he continue to work there, and is there some non-marital money in that particular account as well? He worked there during the marriage, and he worked there after the marriage. And so at the time of the marriage, I believe it was 71% marital at the time of the divorce. So he, when he was working, earning the Qualified Plan, he was also participating in the Non-Qualified Plan pursuant to the plan documents. The plan documents for the Non-Qualified say that the vesting schedule and the participation follows the Qualified Plan. So his Qualified Pension Plan and his Non-Qualified Pension benefits ran at the same time. Although he testified to the two years. Go ahead, please, finish. Thank you. Although he testified to the two years, he didn't produce any evidence as to any non-participation during the time that he was participating in the Qualified Plan, and the plan documents would specify the opposite. So your understanding then is that when the Quadros were tendered, we were talking about 71% of the plan, and that's what's been distributed? That's correct. At this point, anyway, or will be distributed when the time comes? Yes. All right. We have no other questions. If you would like to sum up, please do, and then we will let Mr. Johnson come back. Thank you, Your Honors. We would respectfully request that the Court affirm all rulings. The judgment is clear. It awards all marital retirement benefits to the wife and says that if it cannot be through a Quadro, that the Court reserves jurisdiction to divide those assets, and that is what we ask the Court to do. Thank you. Thank you. All right. Mr. Johnson, you may proceed if you wish to. Your Honors. The Hartford letter was received in 2002. This petition wasn't filed until 2016. In 2008, there was an order entered, an agreed order that stated, and completes all issues of property settlement. This is a pure issue of race judicata. It should have been. This case should have never gotten there. All right. The parties are the same. I understand. But at the time that order was entered in 2008, what were the issues that were discussed? Your Honor, there certainly was a stock option issue. Okay. But the parties included in Judge Equy's order that afternoon or that morning the words, and completes all issues of property settlement. The parties are satisfied. This payment concludes all amounts due to Melissa Englehart for stock options and completes all issues of property settlement. So what you're saying, the third intent of the parties was to adjudicate all of the issues. But generally in race judicata, as you know, you need to have specific parties, the same as we have, and specific identity of issues that were resolved. Her position seems to be saying that may be true, that was the clear intent, but something was left undealt with, something was left ambiguous. So how does that jive with the race judicata? Your Honor, respectfully, if Melissa felt that way when she got that letter from Hartford in 2002, she should have done something with regard to that letter within two years, as opposed to waiting for 14 years before some petition was brought. That's a very compelling argument, I would concede. However, is there any specific time limitation that applies to this kind of a situation that you can call our attention to? If you have knowledge of something, which they originally said in the original judgment, that they knew about everything, at some point litigation has to end. But in 2012, there was something that popped up through the plan administrator that said, whoops, we made a mistake and we miscalculated. Now, what if she, if in 2008 we said everything's fine, but in 2012 a third party, not privy to that particular agreement, says we made a mistake, is she just supposed to say, oh, that's too bad for me? Your Honor, even in 2012, she didn't do anything until 2016. Well, I mean, the issue, though, is, I mean, unless you're trying to do a laches or some sort of equitable relief here, the issue that you've raised is, in 2008, they agreed they had finished the property distribution. That's right. But in 2012, she finds out that not Thomas, but Hartford, has made a mistake. Then her, I respectfully, I think, unfortunately, her problems with Hartford, but not with my client. Well. These are the two parties involved here. And it certainly wouldn't be raised in CASA. Certainly it was long after any issue of either of these lawyers to be responsible for not getting this done. At some point, respectfully, litigation has to end. There's also the matter that additional obligations that are imposed here, like an insurance requirement, like a triangulation payment, which was never in the judgment. Walter, what's your position on the propriety of this $250,000 insurance clause? Pardon me, Your Honor? What is your position on the propriety of the order for the insurance in the amount of $250,000? I think that's an additional obligation that's prohibited by the cases of Redmer and Hubbard decided by this Court. That was never included in the original judgment. That's an additional obligation that's put on my client's back, along with the triangulation clause that didn't exist in the original judgment. In fact, all of the matters were settled in 2001, in October, when these assets were distributed. So are you all in, so to speak, on the fact that there shouldn't have been an insurance obligation in the first place? But I was wondering as well, where did this figure, where is it tied to? How did the trial judge pick the figure of $250,000? I'm sorry. I apologize. I asked if you knew how the trial judge arrived at the figure of $250,000, and are you challenging that amount at all? I don't have a clue how the trial judge arrived at it, and I don't think, respectfully, our opponent has a clue either. The judge didn't know that this was a non-contested agreed matter until way late in the trial. So I don't know. I do have another question. You say that these assets had all been distributed. Clearly, he was not retirement age at the time of the divorce, nor was he retirement age in 2012, was he? Your client, Thomas. It's not. Certainly he wasn't 65. So distribution, the pension benefits had been identified, but until they're actually received, and I'm not sure they're even received now, but until we know what they should be, how can we say that a 2008 order resolves all issues of distribution when they haven't actually been distributed yet? Respectfully, Your Honor, I understand the Court's dilemma and mine, but the order says that the parties were satisfied that this concluded all amounts due Melissa for stock options and completes all issues of property settlement. It's just to me, respectfully, Your Honor, it's inescapable. They signed the order, and they have to live with it like anyone else in our society. So for those reasons, respectfully, we ask that the Court reverse this judgment. Thank you very much, Your Honors. Thank you, counsel, for your argument this morning. We will take the matter under advisement. We will issue a decision in due course, and we're going to stand in recess now. It may take until the next order for the next argument for our next case. Thank you.